UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

KONICA MINOLTA BUSINESS
SOLUTIONS, U.S.A., INC.,

       Plaintiff,                  Case No. 15-11254
                                        Honorable Victoria A. Roberts

v.

LOWERY CORPORATION, d/b/a
APPLIED IMAGING SYSTEMS,
INC., et al.,

       Defendants.
_____/

**ORDER: (1) GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
[ECF No. 431]; AND (2) DENYING DEFENDANTS' MOTIONS
FOR PARTIAL SUMMARY JUDGMENT [ECF Nos. 430, 432]**

## I.    INTRODUCTION

Plaintiff Konica Minolta Business Solutions ("KMBS" or "Konica") and

Defendant Applied Imaging Systems ("AI" or "Applied Imaging") are direct

competitors in the copier industry.  They directly compete in the sale, lease,

and maintenance of multifunction printing and imaging devices and

software in Michigan.

KMBS brings suit against several of its former employees – Steve

Hurt, Robert Bell, Anna Stewart, Randy Magner, Matt Aron, and Linda

Boyle ("Individual Defendants") – and AI, alleging breach of contract,

tortious interference with a contractual relationship, misappropriation of

trade secrets, and civil conspiracy.

Three motions for partial summary judgment are before the Court.

- KMBS seeks summary judgment on liability on Count I
  (Breach of Contract), Count II (Tortious Interference), and
  Count IV (misappropriation).  [ECF No. 431].

- AI moves for summary judgment on the misappropriation
  of trade secrets claim and the type of damages KMBS can
  recover.  [ECF No. 432].

- The Individual Defendants seek summary judgment on the
  breach of contract and trade secret misappropriation
  claims.  [ECF No. 430].

As set forth below, the Court: (1) **DENIES** Defendants' motions; and

(2) **GRANTS IN PART** and **DENIES IN PART** KMBS's motion.

## II.    BACKGROUND

Konica has maintained a significant sales presence in the Detroit

area for years.  In early 2011, Applied Imaging decided to expand its

business into the Detroit market.  To that end, it proposed hiring five sales

employees from KMBS.

On March 18, 2011, AI hired Steve Hurt to launch its Detroit area

office; Hurt was Konica's director of sales for the Detroit area.  In the

months and years that followed, Hurt hired several other KMBS sales and

2

service employees to assist in getting AI's Detroit office off the ground.

Many of those employees were subject to an employment agreement which

precluded them from retaining and/or disclosing KMBS's confidential

information, performing certain tasks on behalf of a KMBS competitor in the

Detroit area, or soliciting certain customers of KMBS.  Konica alleges AI

and Hurt were aware that these former KMBS employees had ongoing

contractual obligations to KMBS.

The other Individual Defendants – along with their former KMBS titles

and their departure dates from KMBS – are: (1) Anna Stewart, Sales

Representative, August 8, 2012; (2) Randy Magner, Named Account

Executive, August 13, 2012; (3) Matt Aron, Senior Account Executive,

March 2013; (4) Linda Boyle, Major Account Executive, March 2013; and

(5) Robert Bell, Branch Manager, July 12, 2013.

KMBS alleges the Individual Defendants stole its trade secret and

other confidential information and brought it with them to Applied Imaging –

with the full knowledge of AI's executives.  Konica claims that Defendants

possessed, transmitted, disclosed, and used Konica's confidential and

proprietary information obtained by the Individual Defendants during their

employment with KMBS. Konica says that this information related to every

aspect of its business in Michigan, including KMBS's confidential customer

3

list for the entire state of Michigan, sales forecasts, lease and machine

information, location maps, confidential pricing lists, pricing comparison

tools, meter readings, customer agreements, prospect lists, compensation

and quota information, inventory, schematics, configurations, service data,

proposals, Konica's custom Excel workbooks, and its sales and service

contract templates.

Konica claims that Defendants used the misappropriated trade secret

information to target and steal Konica's customers in violation of Michigan

law and certain Individual Defendants' contractual obligations.

Each party moves for partial summary judgment.

## III.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), "[t]he Court shall grant

summary judgment if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of

law."  The movant bears the initial burden to inform the Court of the basis

for its motion; it must identify particular portions of the record that

demonstrate the absence of a genuine dispute as to any material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant satisfies

its burden, the non-moving party must set forth specific facts showing a

genuine issue for trial.  *Id.* at 324.  Unsupported, conclusory statements are

insufficient to establish a factual dispute to defeat summary judgment, as is the "mere existence of a scintilla of evidence in support of the [non-movant's] position"; the evidence must be such that a reasonable jury could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009).

In deciding a summary judgment motion, the Court "views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The Court need only consider the cited materials, but it may consider other evidence in the record. Fed. R. Civ. P. 56(c)(3). The Court's function at the summary judgment stage "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. "The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *Lee v. City of Columbus*, 636 F.3d 245, 249 (6th Cir. 2011). However, where the moving party seeks summary judgment in its favor on a claim or issue as to which it bears the burden of proof at trial, that party's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for

5

the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (internal quotation marks, citation, and emphasis omitted).

## IV.   COUNT I – BREACH OF CONTRACT

In Count I, KMBS alleges a breach of contract claim against all Individual Defendants except Hurt (the "Contract Defendants"). The Contract Defendants signed a Confidential Information and Employment Agreement ("Agreement").  The Agreement is identical for each person and contains confidentiality and non-compete/non-solicitation provisions.

The Agreement contains a choice of law provision.  New York law governs this claim.

To succeed, KMBS must prove: "(1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages."  *Swan Media Grp., Inc. v. Staub*, 841 F. Supp. 2d 804, 807 (S.D.N.Y. 2012).

KMBS says the first three elements are easily satisfied and that it is entitled to summary judgment on liability on its breach of contract claim.

The Contract Defendants seek summary judgment as well.  They do not contest that Konica adequately performed under the Agreement or that they violated the terms of Agreement.  Rather, they argue that the Agreement is unenforceable – such that there can be no breach – because

the non-compete and non-solicitation provisions are overbroad, the

protection given to alleged confidential information is overbroad in both

scope and duration, and undefined key terms and conflicting language

render the Agreement ambiguous.

**A.     Relevant Terms of the Agreement**

The Agreement contains an introduction section that defines

Confidential Information:

> I understand that the term "Confidential Information" as used
> throughout this Agreement refers to confidential and proprietary
> business information of KMBS, including information relating to
> KMBS' customers, potential customers, suppliers and the
> management of its business. Confidential Information also
> includes, but is not limited to, KMBS' price lists, customer lists,
> customer records, promotional ideas and strategies, service
> policies and information, sales policies and information,
> marketing policies and information, supplier information,
> territory information, policies and procedures and any other
> information not generally available to the public or treated by
> KMBS as confidential.
>
> I also understand that KMBS has expended substantial sums
> and effort to develop and protect Confidential Information and
> desires to maintain the confidential status of such Information. I
> understand that in connection with my employment, I may
> become aware of certain Confidential Information owned by
> KMBS, as well as the Confidential Information owned by others
> (including entities related to KMBS), which KMBS is obligated
> to keep confidential. I acknowledge that I have an express
> obligation not to divulge, disclose or use for my own benefit or
> for the benefit of anyone other than KMBS any such information
> during or after my employment by KMBS.

7

Therefore, in consideration of my employment by KMBS and of the salary, wages and other consideration paid to me and in consideration of the present and future access provided to me of Confidential Information, I agree as follows:

[ECF No. 432-23, PageID.23820].

Section 3 of the Agreement is titled "Non-Disclosure of Confidential Information" and provides:

During my employment by KMBS and at all times after my employment by KMBS ends, I will not disclose to anyone outside of KMBS or use for my own behalf or on behalf of any other person any Confidential Information (which includes Confidential Information that KMBS has received from others), except upon written consent of KMBS or as required by my duties for KMBS and with KMBS' knowledge. I also will not disclose any such Confidential Information to anyone within KMBS except to other employees or agents of KMBS who need to know such Confidential Information in order to do their jobs for KMBS. I acknowledge that no such Confidential Information is owned by me, and that all such Confidential Information shall remain the exclusive property of the owner thereof (whether or not KMBS) and constitutes valuable trade secrets of its owner. I will not use the confidential information for my own benefit or the benefit of any third party. I will safeguard the confidentiality of all Confidential Information by taking all precautions that KMBS currently requires or may in the future require and I will take any additional precautions that I would take to safeguard my own confidential information.

[ECF No. 432-23, PageID.23821].

Sections 6, 8, and 10 of the Agreement address how employees must handle KMBS property and confidential information:

**6.    Return of KMBS Property.**  Upon termination of my employment with KMBS for any reason, I will return to KMBS

8

all property of KMBS immediately . . . , including, but not limited to, all files, databases, records, documents, drawings, specifications, lists, equipment and supplies, promotional materials and similar items relating to the business of KMBS.

**8.    Maintaining Records.**  I recognize that during the course of my employment I am likely to create and maintain certain records of my activities which contain Confidential Information and I recognize that all such records are the exclusive property of KMBS. I will keep and maintain adequate and current records of all such Confidential Information in the manner and form requested by KMBS. I further agree that all such records shall be the exclusive property of KMBS, shall not be copied and/or removed by me except for KMBS business and shall be made available to KMBS at all times.  When my employment by KMBS ends for any reason, I will return to KMBS all books, records or notes containing the names and addresses of any customers of KMBS, all duplicate invoices and statements pertaining to such customers, and all other information, documents and writings of any nature whatsoever relative to the business of KMBS, and any other information of a confidential or secret nature applicable to KMBS' business, its customers and the manner of conducting its business. I will not keep in my possession or control any copies of any of KMBS' records, correspondence or written material of any kind after my employment with KMBS ends.

**10.    KMBS Policies.**  In addition to complying with the terms and conditions of this Agreement, I also will abide by and comply with any and all existing and future KMBS policies and procedures relating to Confidential Information.

[ECF No. 432-23, PageID.23821-23].

Section 9 of the Agreement sets forth non-compete and non-solicitation provisions:

a.    To the maximum extent permitted by applicable law, for a period of one year after my employment with KMBS ends

(or for a period equal to the length of my employment with KMBS, if shorter), I will not: (i) call on or communicate with any customer or prospective customer of KMBS with whom I have dealt or whose identity I have learned while employed by KMBS; or (ii) directly or indirectly, render services in the geographic territory where I performed my duties for KMBS if my services would relate to the development, manufacture, marketing, sales, merchandising, promotion or maintenance of any products or processes which are similar to, or compete with products or processes offered by KMBS.

b.      The period of one year (or shorter period equal to the length of my employment) referred to in the preceding paragraph shall be extended for a period equal to the duration of any breach of my obligation if I breach any obligation imposed by this section 9.

[*Id.*, PageID.23822].

Finally, Section 17 of the Agreement provides that it "is the final, complete and exclusive agreement between KMBS and [the employee] with respect to the subject matter" and that the employee and KMBS are not "bound by any prior or collateral statements, warranties, representations, agreements, arrangements or course of dealings between them."  [*Id.*, PageID.23824].

## B.      Breach of Contract Claims Under New York Law

Under New York law, "'negative covenants restricting competition are enforceable only to the extent that they satisfy [an] overriding requirement of reasonableness.'"  *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 533 (S.D.N.Y. 2004) (quoting *Reed, Roberts Assocs.,*

10

*Inc. v. Strauman*, 40 N.Y.2d 303, 307 (1976)).  In determining whether a "restrictive covenant is reasonable, and thus enforceable, courts applying New York law typically employ the three-factor reasonableness test set forth in *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382 [] (1999)." *Oliver Wyman, Inc. v. Eielson*, 282 F. Supp. 3d 684, 694 (S.D.N.Y. 2017).  Under this test, a restrictive covenant is reasonable "only if it: (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *BDO Seidman*, 93 N.Y.2d at 388-89 (emphasis omitted); *see also Johnson Controls*, 323 F. Supp. 2d at 533 (courts will enforce a restrictive covenant only "to the extent that it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee").

In applying this standard, the Court must focus on the particular facts and circumstances surrounding the agreement.  *Estee Lauder Companies Inc. v. Batra*, 430 F. Supp. 2d 158, 179-80 (S.D.N.Y. 2006).  "[T]here are no per se lines demarcating what constitutes an unreasonable durational or geographic scope." *Id*. at 180.

Moreover, the Court "need not employ an all or nothing approach to the enforcement of employee restrictive covenants." *Estee Lauder*, 430 F. Supp. 2d at 180. Under New York law, courts may sever and grant partial enforcement of an overbroad restrictive covenant. *Id*.

Indeed, "[w]here courts find restrictions to be unreasonable, . . . they may 'blue pencil the covenant to restrict the term to a reasonable limitation, and grant partial enforcement for the overly broad restrictive covenant.'" *Poller v. BioScrip*, Inc., 974 F. Supp. 2d 204, 221 (S.D.N.Y. 2013) (citation omitted). "[P]artial enforcement, as opposed to invalidating the entire covenant, is justified" absent "overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct." *Johnson Controls*, 323 F. Supp. 2d at 540 (citing *BDO Seidman*, 93 N.Y.2d at 394).

Importantly, in cases like this, where a party argues that an entire restrictive covenant or agreement is invalid because certain parts are overbroad, the Court can partially enforce the restrictive covenant and grant summary judgment, declaring that the restrictive covenant and agreement are valid and enforceable as modified (i.e., as partially enforced). *See BDO Seidman*, 93 N.Y.2d at 394, 397 (ordering the lower court to modify its decision by "granting plaintiff's motion for partial summary judgment declaring the restrictive covenant enforceable as here

12

provided," and explaining that the lower court erred in holding that the entire covenant must be invalidated, and in declining partially to enforce the covenant to the extent necessary to protect BDO's legitimate interest"); *Poller*, 974 F. Supp. 2d at 221-22, 225 (denying employee's summary judgment argument that an overbroad non-solicitation provision made the entire agreement unenforceable, and granting partial enforcement of the non-solicitation provision "limited to those clients that [the employee] developed during her employment with [employer]").

Contract Defendants make numerous arguments regarding why the Agreement is unenforceable.  For sake of clarity, it is easiest to break their arguments into three categories: (1) the noncompete and non-solicitation provisions are overbroad; (2) the scope and duration of the non-disclosure of confidential information provision and the protection given to alleged confidential information is overbroad; and (3) the Agreement is ambiguous because key terms are missing and certain provisions conflict with one another.

### 1.    Breadth of Non-Compete and Non-Solicitation Provisions

The Contract Defendants first argue that the duration and/or scope of the non-compete and non-solicitation provisions are overbroad and unreasonable because, among other things: (1) in addition to a one-year

duration, the other terms of the Agreement place strict limitations on communication with and access to KMBS clients; (2) the duration is not equally imposed on all KMBS employees; (3) the Agreement prohibits solicitation of former, non-current, customers; (4) the language of the Agreement could prohibit a former employee from competing in a geographic area where that employee's sole contact with the area was as superficial and trivial as dropping off lunch at a meeting at the request of a supervisor; and (5) the provisions prohibit solicitation of prospective or potential customers as well as Konica customers with whom the former employee had no relationship.

KMBS argues that the non-compete and non-solicitation provisions are reasonable and necessary to protect its legitimate interests and are neither unreasonably burdensome to the Contract Defendants nor harmful to the public.

### a.     The Non-Compete and Non-Solicitation Provisions are Reasonable in Duration and Geographic Scope

The Court finds that the Agreement's non-compete and non-solicitation provisions are reasonable in time and geographic scope.  *See Crown IT Servs., Inc. v. Koval-Olsen*, 11 A.D.3d 263, 264 (N.Y. App. Div.

1st Dep't 2004) (finding a restrictive covenant reasonable in time and area; it prohibited defendant from servicing plaintiff's clients for one year in same area where prior service was provided).

New York courts consistently hold that one-year non-compete and non-solicitation provisions are reasonable.  *See Reed Elsevier Inc. v. Transunion Holding Co.*, No. 13 Civ. 8739, 2014 WL 97317, at *8 (S.D.N.Y Jan. 9, 2014).  They also routinely find restrictive covenants to be reasonable where they are limited in geographic scope to where the employee performed services for his or her former employer.  *See, e.g., Poller*, 974 F. Supp. 2d at 220-21 (finding non-compete provision that was limited to employee's sales territory reasonable in geographic scope).

Particularly, the limited duration and geographic scope of the non-compete and non-solicitation provisions are reasonable because KMBS establishes that the provisions are necessary to protect against the disclosure or use of KMBS's trade secrets and confidential customer information and to protect client relationships developed by employees at KMBS's expense.  New York law recognizes these as legitimate business interests worth safeguarding.  *See Estee Lauder*, 430 F. Supp. 2d at 177 (citation omitted); *Poller*, 974 F. Supp. 2d at 215-16.

Indisputably, employees in the printing and copying industry commonly change employers, making the use of restrictive covenants necessary to protect employers' legitimate business interests. Without them, employers would not be able to protect their proprietary information or the goodwill established through customer relationships. Indeed, even AI recognizes the need to protect customer relationships developed by employees; it utilizes restrictive covenant agreements to protect those interests. [*See* ECF No. 434-13, PageID.26999].

KMBS also establishes that the Contract Defendants expressly targeted KMBS customers with whom they had developed a significant client relationship while at KMBS; they used existing relationships to divert business away from KMBS – further demonstrating KMBS's need for restrictive covenants in the Agreement.

The Contract Defendants argue that the non-compete and non-solicitation provisions are overbroad in several respects. They say the duration of the non-compete and non-solicitation provisions is overbroad and untenable because KMBS does not apply the same duration to all former employees. For employees who worked for KMBS for less than one year, the duration is equal to the employee's term of employment; for

16

employees who worked for KMBS for one year or longer, the duration is one year.

This argument is baseless.  For it, the Contract Defendants rely on *Estee Lauder*.  There, the employer had a practice of reducing the non-compete periods of other comparable employees.  *See Estee Lauder*, 430 F. Supp. 2d at 181-82.   Here, there are only two groups of employees. The first encompasses those who worked for KMBS for less than one year. The duration of their non-compete and non-solicitation provision equals the length of their employment.  The other group encompasses employees who worked for KMBS for more than one year.  This group captures employees like Contract Defendants; they all worked for KMBS for between nine and twenty-five years.  These two groups are not similarly situated, and *Estee Lauder* is inapplicable.

Similarly baseless is Contract Defendants' argument that "[t]he Agreement … is void for overbreadth where it prohibits former KMBS employees from 'directly or indirectly rendering services' in any geographical territory in which they 'performed duties' while at KMBS." [ECF No. 430, PageID.23349].  This argument relies on the Contract Defendants' erroneous misstatement and then interpretation of "performed duties."

17

Contrary to Contract Defendants' argument, the Agreement does not say "performed duties"; it says "performed my duties."  This distinction is important.  As KMBS points out, "[i]t is axiomatic that a contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed."  *See Johnson Controls*, 323 F. Supp. 2d at 539.  The use of the modifier "my" before "duties" – as opposed to an unlimited modifier, such as "any," or no modifier at all – demonstrates a restriction to the types of duties being referenced.  In this context, the unequivocal language "my duties" could only mean the employee's principal or primary employment duties.

Under the plain meaning of the Agreement, the Contract Defendants argument fails.  A KMBS sales representative who merely picked up lunch one time in an area outside her sales territory, where she had never conducted business, would not be performing her primary duties in that location; thus, the Agreement would not prohibit her from working in that area after leaving KMBS. It is the Contract Defendants' own misstatement and expansive reading of the Agreement which causes them to make this flawed overbreadth argument.

The Contract Defendants next argue that the Agreement is overbroad and it unduly burdens former employees because it: (1) applies to KMBS's

18

former customers; and (2) prohibits former KMBS employees "years after the fact, potentially forever" from contacting current KMBS customers with whom they once had a relationship.

Both aspects of this argument misinterpret the Agreement.  First, as KMBS acknowledges, the Agreement only applies to its current and prospective customers, not former customers.

Second, the Agreement explicitly limits the duration of the non-solicitation and non-compete period to one year after the end of employment with KMBS; thus, it does not prohibit former KMBS employees from contacting current KMBS customers for "years after the fact, potentially forever."

After the one-year period, the Contract Defendants could work for AI in the same location as they served KMBS and they could compete with KMBS with respect to its customers.  Alternatively, *during* the one-year restricted period, the Agreement allows the Contract Defendants to work for AI in a different geographic area than where they performed services for KMBS or in the same area if the products and services they are selling do not compete with KMBS.  The Agreement only prohibits the Contract Defendants from working both in the same geographic area and the same industry as KMBS for one year.  Indeed, even during the restricted period,

19

the Agreement allows the Contract Defendants to utilize their sales skills and earn a livelihood.

Moreover, although the Agreement temporarily prohibits the Contract Defendants from providing competing services in the eastern Michigan market, Applied Imaging is free to compete with KMBS in the market as long as the Contract Defendants are not involved during the one-year period.

The Agreement does not impose an undue hardship on, or unreasonably burden, the Contract Defendants.  *See Poller*, 974 F. Supp. 2d at 220.

In addition, several other printing and copying companies compete in this market, ensuring that the public's freedom of choice is not impaired. Thus, the Agreement is not harmful to the public.  *See Johnson Controls*, 323 F. Supp. 2d at 538.

### b.    Partial Enforcement of Three Aspects of the Non-Solicitation Provision

While the Court finds that the non-compete and non-solicitation provisions of the Agreement are reasonable in duration and geographic scope, the Contract Defendants demonstrate that certain aspects of the non-solicitation portion of the Agreement are overbroad and unnecessary.

This showing, however, does not make the Agreement unenforceable due to overbreadth.  Instead, the Court has the power to partially enforce it.

Partial enforcement is justified because the evidence demonstrates that KMBS "has in good faith sought to protect [] legitimate business interest[s]" and did not engage in "coercive use of dominant bargaining power, or other anti-competitive misconduct."  *See BDO Seidman*, 93 N.Y.2d at 394; *Poller*, 974 F. Supp. 2d at 221-22, 225 (exercising authority to partially enforce restrictive covenant on cross-motions for summary judgment, and deeming restrictive covenant enforceable "as modified by the Court").

First, the Court agrees with the Contract Defendants that the Agreement is overly broad to the extent it prohibits solicitation of *prospective* or *potential* customers of KMBS.  The case law is clear that "protection of client relationships" does not justify prohibiting former employees from soliciting *potential* or *prospective* customers:

> The protection of client relationships does not justify enforcement of the portions of the non-compete clauses relating to potential clients of the employer who are merely solicited [by or] at the direction of [defendants].  An employer does not forge a protectable client relationship with a prospective customer simply by sending the company a business proposal or making a pitch for its business in a sales meeting.  And if the law were to provide otherwise, it would be difficult, if not impossible, to draw the appropriate line for how

21

much contact the employee must have had with a prospective customer to establish a protectable client relationship.

*Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 350

(S.D.N.Y. 2018) (internal citations and quotation marks omitted).

KMBS does not argue that "protection of client relationships" justifies the part of the Agreement which prohibits the solicitation of its prospective customers.  Rather, KMBS relies on *Johnson Controls* and *Marsh* – each of which *refused* to enforce the part of a restrictive covenant prohibiting former employees from soliciting prospective customers of their former employer – for the proposition that such restrictions are permitted "to protect trade secrets and confidential information." *See Johnson Controls*, 323 F. Supp. 2d at 540; *Marsh USA Inc. v. Karasaki*, No. 08 CIV. 4195, 2008 WL 4778239, at *18 (S.D.N.Y. Oct. 31, 2008).

Although both of those cases refused to enforce the "prospective customers" part of the non-solicitation clause – and neither case cites to additional authority supporting its finding – KMBS decided not to provide the Court with any case where such a provision was actually enforced. Nevertheless, the Court need not resolve the parties' dispute regarding the controlling law.

KMBS's only justification for this restriction is to protect its trade secrets and confidential information.  However, such a restriction is not

22

necessary where the Agreement contains a broader provision that prohibits the Contract Defendants from using or disclosing confidential information and trade secrets at any point following their separation from KMBS.

Because the non-disclosure of confidential information portion of the Agreement makes the non-solicitation of potential KMBS customers provision unnecessary, the Court will not enforce the non-solicitation of potential customers provision. *See Johnson Controls*, 323 F. Supp. 2d at 540 ("negative covenants restricting competition are enforceable only to the extent that they satisfy the overriding requirement of reasonableness").

The Court also finds that the non-solicitation provision is overbroad to the extent it applies to those KMBS customers with whom the Contract Defendants had no relationship. Under New York law, KMBS has no legitimate interest to prohibit former employees from soliciting KMBS customers with whom the former employee had no relationship. *See Poller*, 974 F. Supp. 2d at 216-17, 221.

The Court exercises its authority to grant partial enforcement of the provision and severs the phrase "or whose identity I have learned" from the non-solicitation provision. *See id.* In so doing, the Court limits enforcement of the non-solicitation provision to KMBS's customers "with whom [the Contract Defendants] have dealt while employed by KMBS" – i.e., those

23

customers with whom a former employee had some relationship while at KMBS.  As the Contract Defendants acknowledge, numerous cases deem similar one-year non-solicitation provisions with such a limitation to be reasonable.  [*See* ECF No. 439, PageID.28414].  *See, e.g.*, *Johnson Controls*, 323 F. Supp. 2d at 529-30, 536; *Marsh*, 2008 WL 4778239, at *3.

Finally, the Court exercises its authority to "blue pencil the covenant" with respect to the Agreement's use of the term "or communicate with" in the non-solicitation provision.

The Contract Defendants contend that the language "communicate with" makes the non-solicitation provision overly broad because it deems *any* communication – including those unrelated to the service or sale of copier products – improper solicitation.  Thus, they say the Agreement even prohibits a former employee's "get-together with former clients who are also personal friends," as well as where a former KMBS employee answers an unsolicited call from a disgruntled KMBS customer and says only that she left KMBS and she is unable to talk because she is subject to a non-compete agreement.

While this clearly is not the type of conduct KMBS seeks to prohibit – and KMBS makes no such frivolous claims – out of an abundance of caution, the Court severs the term "or communicate with" from the

24

Agreement's non-solicitation provision and grants partial enforcement of the provision as it remains.  The remaining portion of the non-solicitation provision still adequately protects KMBS's legitimate interests; it prohibits former employees from calling on customers with whom they dealt while employed by KMBS.

With this language excised, the Court finds the non-solicitation and non-compete provisions of the Agreement to be reasonable in time and geographic scope, necessary to protect KMBS's legitimate interests, not unduly burdensome to the Contract Defendants or harmful to the public, and enforceable.

### 2. Duration of Non-Disclosure of Confidential Information Provisions

The Contract Defendants next argue that the scope and duration of the non-disclosure of confidential information provisions are overly broad because they: (1) require former KMBS employees to take all precautions that KMBS "currently requires or may in the future require"; (2) would allow KMBS to shield publicly available information from use by designating it as confidential; and (3) prohibit former KMBS employees from disclosing or using confidential information "at all times after [their] employment [with] KMBS ends."  These arguments fail.

25

KMBS appropriately points out that the Contract Defendants' first argument is misleading.  If the Contract Defendants had returned all confidential information to Konica when they left KMBS employment, there would be no need to be concerned with, or stay abreast of, future policies on maintenance of information.  Thus, this requirement does not make the non-disclosure provisions overbroad.

The Contract Defendants' second argument is also misleading and wrong.  The Agreement's definition of confidential information excludes information "generally available to the public."  Thus, KMBS cannot shield publicly available information by designating it confidential.

Finally, the open-ended nature of the non-disclosure of confidential information provision does not by itself mean the restriction is overly broad or unenforceable.  KMBS says the Agreement's non-disclosure of confidential information provision "is justified by the need to protect [its] trade secrets and confidential information."  *See Johnson Controls*, 323 F. Supp. 2d at 540.  The Court agrees with KMBS.

Restrictive covenants aimed at protecting against misappropriation of an employer's trade secrets or confidential customer information are "enforceable to the extent necessary to prevent the disclosure or use of [such information]."  *Ashland Mgmt. Inc. v. Altair Investments NA, LLC*, 59

A.D.3d 97, 102 (N.Y. App. Div. 1st Dep't 2008).  "[T]he mere fact that …
confidentiality agreements [are] not limited in duration does not necessarily
make them ipso facto unenforceable."  *Id.* at 104.  Indeed, "[p]rotecting
trade secrets and truly confidential information . . . does not have to be time
limited in every instance where the covenant does not otherwise prevent a
former employee from pursuing his or her livelihood or interfere with
competition."  *Id.*

Like *Ashland*, the non-disclosure of confidential information provision
"do[es] not perpetually restrict defendants from working for someone else
or in a similar business. . . .Rather, the [A]greement[] at issue merely
attempt[s] to prevent defendants from unfairly using plaintiff's trade secrets
[and confidential information]."  *See Ashland*, 59 A.D.3d at 105 n.2.
Particularly, as discussed above, the Agreement does not prohibit the
Contract Defendants from using publicly available information related to
KMBS's customers and business.  There is no reason to believe the
restrictive covenant would unreasonably prevent the Contract Defendants
from pursuing their livelihood or from fairly competing with KMBS after the
one-year non-compete and non-solicitation restrictions expire.

The Court finds that the non-disclosure of confidential information
portion of the Agreement is not overly broad.  *See id.* at 105.

27

### 3.    The Agreement is Not Ambiguous

The Contract Defendants' third and final argument is that the Agreement is ambiguous and unenforceable because – despite requiring its signatories to take "all precautions KMBS currently requires," to keep confidential information "in the manner and form requested by KMBS," and to be bound by "the attached definitions" – the terms "manner and form" and "precautions required" are undefined and there are no attached definitions.

Contract Defendants also say the Agreement is ambiguous because the requirement that employees abide by "any and all existing and future KMBS policies and procedures relating to Confidential Information" in Section 10 of the Agreement "is countermanded in Section 18 [sic], which states the Agreement is 'the final, complete and exclusive agreement between KMBS and [employee] with respect to the subject matter hereof,' and that neither the employee nor KMBS are bound by 'any prior or collateral statements, warranties, representations, agreements, arrangements or course of dealings between them.'"  The Contract Defendants mistakenly say the merger clause is in Section 18; it actually is in Section 17.

Contract Defendants made the same argument regarding the lack of attached definitions in its motion for judgment on the pleadings.  The Court found that their argument failed because they did not demonstrate that the Agreement was so vague or indefinite so as to make it impossible to determine whether a breach occurred. *See Swan Media*, 841 F. Supp. 2d at 808.  This continues to be true.

As KMBS says, the key non-disclosure of confidential information provisions of the Agreement are unambiguous and demonstrate that the Contract Defendants entered into an agreement.  Additionally, there are no *essential* terms missing that would preclude a determination concerning breach by the Contract Defendants.  Indeed, KMBS does not allege that the Contract Defendants violated some unidentified policy concerning confidential information.  KMBS alleges the Contract Defendants breached the unambiguous provisions regarding return of property, non-disclosure of confidential information, and non-competition and non-solicitation.

Because Contract Defendants fail to show that an *essential* term is undefined, the Agreement is not unenforceable due to ambiguity.  *See Kowalchuk v. Stroup*, 61 A.D.3d 118, 121 (N.Y. App. Div. 1st Dep't 2009) ("[M]eeting of the minds must include agreement on all essential terms.").

Moreover, while it is unnecessary to determine whether Section 10 of the Agreement is inconsistent with Section 17's general merger clause, even if there is an inconsistency between the provisions, it would not render the Agreement unenforceable because: (1) the parties agreed on the essential terms of the Agreement; and (2) the more specific provision relating to the applicability of KMBS's policies and procedures would govern over the general merger clause based on the "well-established principle of contract interpretation that specific provisions concerning an issue are controlling over general provisions," *see Huen New York, Inc. v. Bd. of Educ. Clinton Cent. Sch. Dist.*, 67 A.D.3d 1337, 1338 (N.Y. App. Div. 4th Dep't 2009).

### 4.    The Agreement is Valid and Enforceable

Except as modified with respect to the three aspects of the non-solicitation provision, the Agreement is valid and enforceable.

The Contract Defendants are not entitled to summary judgment on their argument that the Agreement is unenforceable as a matter of law due to overbreadth.

KMBS is entitled to partial summary judgment declaring the Agreement partially enforceable, as set forth (i.e., modified) above.

Additionally, as explained further below, because KMBS establishes each of the remaining elements of its breach of contract claim, other than with respect to the precise amount of damages it suffered, and shows that there is no genuine dispute as to any material fact, KMBS is entitled to summary judgment as to liability on their breach of contract claim against the Contract Defendants.

### C.    KMBS Performed Under the Agreement

KMBS establishes the second element of its breach of contract claim – i.e., that it adequately performed under the Agreement.  *See Swan Media*, 841 F. Supp. 2d at 807.

The Contract Defendants do not dispute this element.

### D.    The Contract Defendants Breached the Agreement

The third element of its breach of contract claim requires KMBS to establish that the Contract Defendants breached the Agreement.  *Id.*  A single instance of breach is sufficient for KMBS to satisfy this element. KMBS more than satisfies this element.

Among other things, by signing the Agreement, each of the Contract Defendants agreed that for one year after their employment with KMBS ended, they would: (1) not call on any customer of KMBS with whom they dealt while employed by KMBS; and (2) not, directly or indirectly, render

31

services in the geographic territory where they performed their duties for KMBS (i.e., the eastern Michigan area) if those services would compete with products or processes offered by KMBS.  Additionally, the Contract Defendants agreed to return to KMBS at the end of their employment all KMBS property, including documents, records, and materials related to KMBS's business and/or customers.

KMBS sets forth undisputed evidence demonstrating that each of the Contract Defendants breached at least one or more of the above provisions of the Agreement.

### 1.    Matt Aron

KMBS shows that Matt Aron resigned from his Senior Account Executive position at KMBS's Troy, Michigan branch on March 1, 2013.  He began working for AI three days later as a Major Account Executive. There, Aron handled single machine placement business in the Detroit area – the same area he worked for KMBS.  He sold competing printing and imaging products and services to customers in the same geographic area, in direct violation of the Agreement.

Aron also violated the Agreement by soliciting KMBS customers in March, April and May 2013.  For example, on March 26, 2013, Aron began communicating with Advanced Assembly Products, Inc., a KMBS customer,

regarding their KMBS contracts, and by April 11, 2013, Aron had scheduled a meeting with the customer to discuss their "Konica Minolta Exit Proposal."

In an email exchange spanning from the end of April 2013 to the beginning of May 2013, Aron solicited the business of a different KMBS customer, even promising that "Applied will make all [KMBS] lease payments thru and including the December payment and return the Konica [equipment] to them (KMBS) as well." [ECF No. 433-40, PageID.26229].

On May 23, 2013, Aron emailed Presbytery of Detroit, a KMBS customer with whom he had worked while at KMBS, attaching a price proposal on behalf of AI and a statement promising to pay off the remainder of its lease with KMBS.

While Aron attempts to dispute some of these allegations, he explicitly admits the final allegation regarding his solicitation of Presbytery of Detroit – a KMBS customer with whom he dealt with at KMBS. This alone demonstrates a breach of the Agreement as a matter of law: Aron solicited a KMBS customer with whom he dealt and also rendered competing services in the same geographic area as he worked for KMBS within a year after his employment with KMBS ended.

Aron's attempts to dispute the other instances of breach are unavailing; they are conclusory and fail to acknowledge or contradict the

33

objective evidence which blatantly contradicts Aron's version of events, and clearly shows breach. *See Universal Settlements Int'l, Inc. v. Nat'l Viatical, Inc.*, 568 Fed. Appx. 398, 402 (6th Cir. 2014) (disregarding declaration testimony that was clearly contradicted by the record and noting that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of . . . summary judgment" (citation omitted)); *Marvin v City of Taylor*, 509 F.3d 234, 239 (6th Cir. 2007) (in deciding a summary judgment motion, a court must only draw reasonable inferences in favor of the nonmoving party; it need not construe the record "in such a manner that is wholly unsupportable—in the view of any reasonable jury" considering the objective evidence); *Peterson v. Hall*, No. 11-15154, 2013 WL 6050136, at *4 (E.D. Mich. Nov. 15, 2013) (MDOC records "blatantly contradict[ed] plaintiff's version of events" and established that the defendant was elsewhere and could not have been the person who allegedly shut the plaintiff's hand in his cell door).

No genuine issue of material fact exists. Aron breached the Agreement.

### 2.    Rob Bell

Rob Bell began working at Applied Imaging as a Major Account Sales Manager on July 16, 2013 – just four days after he resigned from his Branch Sales Manager position at KMBS.  When he started at AI, Bell ran a team of five Major Account representatives which sold printing and imaging products and services to companies that had 25 devices or more.

KMBS establishes that Bell breached the Agreement by keeping KMBS property at the end of his employment.  Bell admits that he retained KMBS property – including, but not limited to: (1) a KMBS document titled "Copy of Contract Report for Wix Ann Tol," which has 5385 rows of information about a significant amount of KMBS customers; (2) a KMBS deployment guide that provides KMBS service managers with procedures and specific customer requirements; (3) a KMBS spreadsheet titled MPS Template, which contains KMBS pricing and embedded formulas created by KMBS; and (4) KMBS cost analysis spreadsheets – among other documents – which Bell used by "tweak[ing] the KM labeled stuff to be Applied Imaging branded materials."

While Bell contends that these materials are not trade secrets, that is irrelevant.  By failing to return the documents to KMBS at the end of his employment, he breached the Agreement.

Moreover, KMBS demonstrates that Bell, like Aron, breached the Agreement in the year after he left KMBS by rendering services that compete with KMBS in the same geographic area in which he performed duties for KMBS.

No genuine dispute of material fact on these issues exists.  Bell breached the Agreement.

### 3.    The Three Other Contract Defendants

KMBS also establishes that Linda Boyle, Randy Magner, and Anna Stewart breached the Agreement.

At a minimum, undisputed evidence shows that Boyle breached by: (1) rendering services for AI that competed with KMBS and which were in the same territory she performed her duties for KMBS in the year following her employment with KMBS; (2) retaining KMBS property – including downloading the contents of her KMBS computer onto a personal flash drive on her last day of work for KMBS – after she ended her employment with KMBS; and (3) soliciting business from South Lyon Community Schools – a KMBS customer within the territory she provided service at KMBS and with whom she dealt while at KMBS – in February 2014, which fell within her one-year non-compete and non-solicitation period.

KMBS establishes that Randy Magner breached the Agreement by: (1) rendering competing printing and imaging services for AI in the same sales territory he had at KMBS during the one-year non-compete period; (2) retaining KMBS property after his employment with KMBS ended; and (3) directly and/or indirectly soliciting several KMBS customers (e.g., Zion, Arbor Oakland Group/Arbor Press, and The Wyndgate) during the one-year restricted period following his employment with KMBS.

KMBS demonstrates that Anna Stewart breached the Agreement by: (1) engaging in prohibited competition in the same geographic territory as she worked for KMBS during the one-year restricted period; (2) directly and/or indirectly soliciting several KMBS customers during one-year restricted period – including, but not limited to: Troy School District, Amerisure, Avondale Schools, Great Lakes Wine and Spirits, and East Detroit Public Schools (with whom, she admits she began soliciting in September 2012 and "had numerous meetings with [them]" over the following two years); and (3) retaining KMBS property – including, among other things, a "KMBS CPP calculator" – after her employment with KMBS ended.

Boyle, Magner, and Stewart's feeble response to this overwhelming evidence is: "[They] similarly dispute Konica's breach of contract proofs."

37

This is insufficient to overcome KMBS's motion.  *See United States v. Robinson*, 390 F.3d 853, 886 (6th Cir. 2004) ("We have cautioned that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived, and that it is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (citations and internal quotation marks omitted)).

In addition to the above instances of breach, KMBS claims that the Contract Defendants breached the Agreement by – among other things – retaining, using, and/or disclosing KMBS's confidential information. However, the Contract Defendants demonstrate genuine issues of material fact on these claims.  This does not matter.  A defendant's single breach is sufficient to sustain KMBS's breach of contract claim against that defendant, and because no genuine issue of material fact exists as to the breaches discussed, KMBS establishes the third element of its breach of contract claim: i.e., each of the Contract Defendants breached the Agreement.

### E.    Damages

KMBS says that although additional discovery and expert testimony is necessary to determine the exact amount of its damages, it is undisputed

that KMBS suffered at least some damages as a result of the Contract

Defendants' breach of the Agreement.  Therefore, it seeks summary

judgment on liability.

KMBS identifies evidence showing that Applied Imaging began

realizing income from certain KMBS customers in the years after the

Contract Defendants began working for it, and that KMBS had decreased

revenue from those customers during that time.  KMBS says this, along

with evidence showing that the Contract Defendants solicited some of

those customers during their one-year restricted period, is sufficient to

establish causation.  KMBS says, "it is reasonably certain that if the

Contract Defendants had not breached the Agreements, KMBS would have

retained or expanded its business with the Common Customers and/or, in

some cases, would not have found it necessary to make monetary

concessions to retain their business."

This does not satisfy KMBS's initial burden to demonstrate the

absence of a genuine dispute as to any material fact related to causation

and damages.  While KMBS identifies evidence that would allow a

reasonable juror to find that the Contract Defendants' breach of the

Agreement caused KMBS damages, it fails to show that a reasonable jury

could find *only* in its favor as to causation.  *See Calderone*, 799 F.2d at 259

39

("Where the moving party has the burden . . . [its] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." (internal quotation marks, citation, and emphasis omitted)).

KMBS's general reliance on the drop in its hardware and service revenue after the time the Contract Defendants left for AI – and AI's rise in revenue during the following years – is insufficient to satisfy its burden. KMBS fails to show which breaches of the Agreement led to corresponding damages.  For example, to establish the causal link between Contract Defendants' breaches of the Agreement and its damages, KMBS must show – among other things – that: (1) the Contract Defendants used KMBS's property and/or confidential information to acquire business to its detriment; and/or (2) but for the Contract Defendants leaving, KMBS would have maintained the business and/or customer(s) it alleges it lost.

Because genuine issues of material fact exist with respect to KMBS's damages and causation, KMBS is not entitled to summary judgment on liability on its breach of contract claim.  *See Suffolk Cty. Water Auth. v. J.D. Posillico, Inc.*, 267 A.D.2d 301, 302 (N.Y. App. Div. 2nd Dep't 1999) (finding that issues of fact as to causation preclude granting summary judgment on liability on breach of contract claim).

### F.    Conclusion on Breach of Contract Claim

The Court GRANTS KMBS partial summary judgment on two issues; the Court declares that the Agreement is valid and partially enforceable – as modified (partially enforced) – and declares that the Contract Defendants breached the Agreement as specified above.  Because causation is not established, the Court DENIES KMBS's request for summary judgment on liability on its breach of contract claim.

The Court DENIES the Individual Defendants' motion for summary judgment with respect to KMBS's breach of contract claim.

## V.    COUNT II – TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP

KMBS alleges a tortious interference with contractual relations claim against AI and Steve Hurt, and seeks summary judgment as to liability on this claim.

The Court previously held that, while this claim was not preempted, KMBS cannot recover under this claim for conduct based on misappropriation of trade secrets.

The choice of law provision in the Agreement which dictates that New York law governs the breach of contract claim applies only to the breach of contract claim.  Because this is a diversity action, Michigan's substantive

tort law applies to the remaining claims. *Via The Web Designs, LLC v. Beauticontrol Cosmetics, Inc.*, 148 Fed. Appx. 483, 487 (6th Cir. 2005).

The Court has decided that KMBS establishes the first two elements of a tortious interference with a contract relationship claim: (1) the existence of a contract between itself and a third party; and (2) a breach of that contract. *Id.*

The outcome of this claim rests on the third element: that the breach was unjustifiably instigated by the defendant. *Id.* "[T]he third element requires more than just purposeful or knowing behavior on the part of the defendant." *Auburn Sales, Inc. v. Cypros Trading & Shipping, Inc.*, 898 F.3d 710, 715 (6th Cir. 2018) (citation and internal quotation marks omitted). "Instead, 'the interference with a business relationship must be improper in addition to being intentional.'" *Id.* (citation omitted).

Thus, to satisfy the third element, KMBS must establish "two distinct requirements . . . : an *intentional* interference and an *improper* interference." *Id.* at 716.

> First, "intentional" interference means that the defendant's purpose or desire is to cause an interference with a contract or business relationship. Indeed, "[s]ince interference with contractual relations is an intentional tort, it is required that ... the injured party must show that the interference with his contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct." Michigan appellate courts describe this intent as an "essential

element of a claim of tortious interference"—often
characterizing a defendant's intentional conduct as having
"unjustifiably instigated or induced" a breach of contract.  But
regardless of how Michigan courts describe this intent, "[t]he
essential thing is the purpose to cause the result.  If the actor
does not have this purpose, his conduct does not subject him to
liability ... even if it has the unintended effect of deterring the
third person from dealing with the other."

Second, "improper" interference means conduct that is either
"(1) wrongful *per se*; or (2) lawful, but done with malice and
unjustified in law."  "A 'per se wrongful act' is an act that is
inherently wrongful or one that is never justified under any
circumstances.'"  "On the other hand, 'if the defendant's
conduct was not wrongful per se, the plaintiff must demonstrate
specific, affirmative acts that corroborate the unlawful purpose
of the interference.'"  Said another way, the "improper" nature
of an interference is shown by proving either (1) conduct that is
inherently wrongful, or (2) conduct that is inherently legitimate,
but which becomes wrongful in the context of the defendant's
actions and malice. But either way, "[t]he interference must be
both intentional and improper."

*Auburn Sales*, 898 F.3d at 716-17 (internal citations and footnotes omitted).

KMBS says AI and Hurt consciously and unjustifiably induced the

Contract Defendants to breach the Agreement by: (1) employing them in

violation of the Agreement; (2) orchestrating a shadow commission scheme

to conceal the Contract Defendants' breaches: commission for KMBS

customers purportedly solicited by the Contract Defendants was paid to the

Contract Defendants but assigned on the books to a different sales

representative; (3) participating in the Contract Defendants' solicitation of

43

KMBS customers; and (4) participating in their use and disclosure of KMBS's confidential information.

Hurt and AI say KMBS cannot establish the third element because their conduct was motivated by a legitimate business purpose, such that it does not constitute improper motive or interference.  However, the fact that they acted for their "personal or pecuniary benefit" is not a *per se* defense to their actions.  *See Jim-Bob, Inc. v. Mehling*, 178 Mich. App. 71, 96 (1989) ("[T]he fact that certain actions are taken with the intent that they inure to the personal or pecuniary benefit of the defendant cannot, *per se*, in our view, weave a broad and impenetrable blanket of immunity from liability for those actions. Certainly, in nearly all cases of interference, the defendant hopes to benefit by way of a resulting advancement of its personal or business interests. But these ends do not necessarily justify the means undertaken. A defendant may not, with impunity, sabotage the contractual agreements of others, [and then cure its wrong merely by saying] that its actions were motivated by purely business interests. . . ."); *Tata Consultancy Servs., v. Systems. Int'l, Inc.*, 31 F.3d 416, 425 (6th Cir. 1994) ("Malice could be inferred from the wrongful act of inducing breach of the contract, and it would be no defense that [defendant] acted not out of

hatred or ill-will toward [plaintiff], but solely in the interest of feathering its own economic nest at the expense of a competitor.").

Importantly, "the defendant's motive is but one of several factors which must be weighed in assessing the propriety of the defendant's actions." *Jim-Bob*, 178 Mich. App. at 96-97; *Auburn Sales*, 898 F.3d at 717 n.3 ("When determining whether otherwise lawful conduct becomes wrongful and thus improper, a court can consider several factors, such as the nature of the conduct, the actor's motive, the parties' competing interests, social interests and policy considerations, proximate cause, and the relationship between the parties.").

Nevertheless, the Court finds that KMBS is not entitled to summary judgment on this claim.  In addition to certain material facts which remain in dispute – such as whether AI and Hurt solicited the Contract Defendants or the Contract Defendants initiated the relationship, and whether the "shadow commission scheme" actually existed – KMBS fails to establish the "*intentional* interference" requirement of the third element.  *See Auburn Sales*, 898 F.3d at 716.

KMBS's motion for partial summary judgment is DENIED with respect to its tortious interference with a contractual relationship claim.

## VI.    COUNT IV – MISAPPROPRIATION OF TRADE SECRETS

In Count IV, KMBS alleges Defendants misappropriated its trade secrets in violation of the Michigan Uniform Trade Secret Act ("MUTSA").

As a threshold matter, contrary to the Individual Defendants' argument, New York law does not govern any part of this claim.  MUTSA is a Michigan statute; Michigan law applies.

### A.    Misappropriation of Trade Secrets Claims Under MUTSA

To establish a claim for misappropriation of trade secrets under MUTSA, a plaintiff must prove that: (1) it has a protectable trade secret; and (2) the defendant improperly acquired, disclosed, or used its trade secret and knew, or had reason to know, that the trade secret was acquired by "improper means."  *Ajuba Int'l, LLC v. Saharia*, 871 F. Supp. 2d 671, 691 (E.D. Mich. 2012); Mich. Comp. Laws § 445.1902(b).  In relevant part, "improper means" includes "breach, or inducement of a breach of a duty to maintain secrecy."  Mich. Comp. Laws § 445.1902(a).

MUTSA defines a "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process" that:

> (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use[;] [and]

46

(ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mich. Comp. Laws § 445.1902(d).

To obtain protection as a trade secret, information must "'be a secret.'" *Dura Global Techs., Inc. v. Magna Donnelly Corp.*, 662 F. Supp. 2d 855, 859 (E.D. Mich. 2009) (quoting *Kubik, Inc. v. Hull*, 56 Mich. App. 335, 347 (Mich. Ct. App. 1974)).  "Trade secrets do not 'encompass information which is readily ascertainable, i.e., capable of being acquired by competitors or the general public without undue difficulty of hardship.'" *Id.* (quoting *Kubik*, 56 Mich. App. at 348).  The owner of a trade secret must take "sufficient measures . . . to guard the secrecy of the information and preserve its confidentiality."  *Kubik*, 56 Mich. App. at 347-48.

### B.    KMBS's Misappropriation of Trade Secret's Claim

KMBS identifies hundreds of specific documents and files which it claims are trade secrets Defendants misappropriated.  Generally, KMBS's alleged trade secrets fall into one of four categories: (1) customer lists – including documents called "Everest," "the List," and the "Target Account Spreadsheet"; (2) KMBS "LESA" pricing; (3) KMBS "Price Books"; and (4) KMBS cost per page ("CPP") calculators.

Defendants say KMBS fails to identify any protectable trade secrets and that they are entitled to summary judgment.  They argue that KMBS

relies on generic terms and conclusory allegations, rather than describing its trade secrets with specificity. *See Ajuba Int'l, LLC v. Saharia*, No. 2:11-CV-12936, 2014 WL 3420524, at *7 (E.D. Mich. July 14, 2014) ("[T]he plaintiff must identify the trade secrets with specificity."). This argument fails. KMBS does identify its alleged trade secrets with sufficient particularity.

Alternatively, Defendants say that even if KMBS identified its alleged trade secrets with sufficient detail, its misappropriation claim still fails because Konica's alleged trade secrets are not entitled to trade secret protection for several reasons.

Notably, Defendants do not seek summary judgment on the ground that they did not misappropriate KMBS's information. However, AI says it reserves the right to address the issue of misappropriation following the close of discovery or at a time identified by the Court. The record is filled with evidence – some disputed, some not – of the Individual Defendants' alleged misappropriation of KMBS information, and there is minimally a question of fact regarding AI's participation in and/or consent to the misappropriation. Defendants, unquestionably, would be unable to demonstrate an entitlement to summary judgment on the issue of misappropriation; their only hope is that the information they

48

misappropriated is not a trade secret, such that any misappropriation of that information was not a violation of MUTSA. The Court will not allow dispositive motions on misappropriation.

KMBS also seeks summary judgment on liability on its MUTSA claim. KMBS says it sufficiently describes its trade secrets and demonstrates that: (1) its trade secret information provides independent economic value and is not readily ascertainable by proper means; (2) it expended considerable resources to compile and maintain its alleged trade secrets; and (3) despite taking sufficient measures to preserve the confidential nature of its trade secrets, Defendants misappropriated them.

Neither side is entitled summary judgment.

### 1.    KMBS's LESA Pricing and CPP Calculators

Defendants argue that KMBS's LESA pricing information and CPP calculators are not trade secrets because: (1) the LESA pricing information is publicly available and not secret; and (2) the CPP calculators are widely used in the industry, not secret, and contain only a simple mathematical formula. The Court agrees.

Defendants show – and Konica fails to rebut – that the LESA pricing information is publicly available, and that CPP calculators are widely used in the industry, contain no secret formula, and could be easily and quickly

49

created by someone who knows how to use Microsoft Excel.  These

materials are not trade secrets.  *See PrimePay, LLC v. Barnes*, No. 14-

11838, 2015 WL 2405702, at *21 (E.D. Mich. May 20, 2015) ("Matters of

public knowledge or general knowledge in the industry, or ideas which are

well known or easily ascertainable, cannot be trade secrets." (citation

omitted)).

### 2.    KMBS's Price Books

Defendants say KMBS's Price Books are not trade secrets because:

(1) Konica discloses its pricing to customers and lists some of its pricing on

its website; (2) KMBS pricing has no economic value to Defendants since

AI does not sell Konica products; and (3) KMBS failed to adequately protect

the secrecy of this information.

KMBS shows genuine issues of material fact exist regarding whether

its Price Books are protectable trade secrets.

Although KMBS discloses some pricing to the public and its

customers know prices under their specific contracts, Konica demonstrates

that its Price Books contains information which it does not disclose to

customers and which it has not made public.  Particularly, KMBS shows

that its Price Books include multi-tiered pricing options for its equipment

and services that depend on several factors, as well as internal discounted

prices that could be offered to customers based on particular circumstances.  And, contrary to Defendants' argument, even though AI does not sell KMBS products, Konica's internal, confidential pricing information has value to a competitor, like AI, because it would allow a competitor to formulate customer proposals with very competitive pricing and with knowledge of what KMBS would likely charge for similar products. *See Dice Corp. v. Bold Techs.*, 556 Fed. Appx. 378, 385 (6th Cir. 2014) ("Of critical importance here, to be worthy of trade secret status, the secret information must afford the owner a competitive advantage by having value to the owner and potential competitors." (citation omitted)); *PrimePay*, 2015 WL 2405702, at *22 (noting that an employer's "pricing schemes" and "its markups" are examples of possible trade secrets under MUTSA (citation omitted)).  KMBS also shows that questions of fact exist regarding whether it took sufficient steps to maintain the secrecy of this information.

Questions of fact exist regarding whether KMBS's Price Books are entitled to trade secret protection.

### 3.    KMBS's Customer Lists

Michigan courts typically find customer lists which only contain basic customer information and lists created by a former employee defendant are not trade secrets under MUTSA.  *See*, *e.g.*, *McKesson Med.-Surgical Inc.*

51

*v. Micro Bio-Medics, Inc.*, 266 F. Supp. 2d 590, 594, 596 (E.D. Mich. 2003)
(finding a customer list compiled by the former employee defendant from
personal and public sources was not a protectable trade secret). "Whether
a customer list qualifies as a trade secret depends on if the information is
'readily obtainable by proper means' or 'discoverable only through
extraordinary efforts and [significant] expenditure of time and money.'"
*Innovation Ventures, LLC v. Aspen Fitness Prod., Inc.*, No. 11-CV-13537,
2015 WL 11071470, at *6 (E.D. Mich. Mar. 31, 2015) (citation and internal
ellipsis omitted).

For the reasons below, the Court finds that whether Konica's
customer lists are protectable trade secrets is a triable issue of fact. *See
Ashland*, 59 A.D.3d at 102 ("Whether a plaintiff's customer list and/or other
proprietary information constitutes a trade secret or is readily ascertainable
from public sources is ordinarily a triable issue of fact."). Particularly, the
following material facts, among others, remain in dispute and preclude
summary judgment on Konica's customer lists: (1) whether the information
is readily ascertainable by proper means; (2) whether KMBS expended
significant resources (time and/or money) to compile its customer lists; (3)
whether the customer lists provide economic value to KMBS and/or a

competitor; and (4) whether Konica took sufficient steps to protect its customer lists.

KMBS's customer lists contain more than just basic customer information; additionally, they include the relevant customer contact person and phone number, model and serial numbers for KMBS equipment, usage and service history, Konica's assigned service technicians, customer contract information, and detailed information about Konica's sales territories and "machines in field."

Konica's customer lists appear similar to the types of lists which courts have found to be protectable under MUTSA. For example, in *Innovation Ventures*, the court found the plaintiff established at summary judgment that its customer list was a protected trade secret where the list "contained information beyond contacts and content generally known to the public, [such as] specifically identified distributors and confidential customer-specific pricing information." 2015 WL 11071470, at *6. *See also Kelly Servs., Inc. v. Noretto*, 495 F.Supp.2d 645 (E.D. Mich. 2007); *Merrill Lynch v. Ran*, 67 F.Supp.2d 764, 775 (E.D. Mich. 1999) (finding that brokerage firm's list of client names, phone numbers, and other confidential information was entitled to protection as a trade secret under MUTSA)).

Defendants argue that KMBS's customer lists are not trade secrets and/or are not entitled to trade secret protection because, among other things: (1) the information in the lists is publicly available and/or readily ascertainable by proper means; (2) courts have found that customer lists are not protected under MUTSA; and (3) KMBS failed to take sufficient measures to protect the alleged confidential nature of this information. Defendants say the information is available publicly from customers and from commercial resources, such as a UCC subscription or private data compiling companies.

For this argument, Defendants rely on two lists, which they claim were available in the "commercial market"; they say one is a UCC list, and the other was from a private company.  However, as KMBS points out, the origin of the lists is unclear, and the lists are unauthenticated.

Defendants rely upon cases that are distinguishable from the facts here.  *See ATC Distrib. Grp., Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700 (6th Cir. 2005); *McKesson*, 266 F. Supp. 2d 590.

In *McKesson*, the customer list was created and maintained by the defendant employee from public sources – like phone books – and personal sources he compiled throughout his career.  The court found that the customer list could not support the former employer's trade secret claim

54

because it "was not a list [the employer] kept itself, nor was it compiled from any" of the employer's sources.  *McKesson*, 266 F. Supp. 2d at 594, 596 (E.D. Mich. 2003).

These customer lists, however, were not created by, or the property of, the Defendants; they belong to Konica.  Konica's customer lists also contain more information than the list in *McKesson*, and the majority of the information is not discoverable from a phone book.

In *ATC*, the court found a customer list was not protectable under the Kentucky Uniform Trade Secrets Act because there was "no evidence that the identities of transmission parts customers contained on [plaintiff's] customer list was obtained through great effort or expense, or that the names on the list were not discoverable from a telephone book or similar legitimate source."  *ATC Distrib. Grp.*, 402 F.3d at 714.

KMBS's customer lists contained more information than the lists in *ATC*.  Moreover, unlike in *ATC*, KMBS presents evidence that compiling the information in its lists took great time and effort; that some of the information was not publicly available or known by customers; and that the information customers did have was not all available from one source in its entirety.  [*See* ECF No. 434-11, PageID.26860; ECF No. 433-29, PageID.26123-24, 26127-29].

Konica demonstrates a question of fact exists on whether the information in its customer lists is "readily ascertainable, i.e., capable of being acquired by competitors or the general public without undue difficulty of hardship." *See Dura Global*, 662 F. Supp. 2d at 859 (citation omitted).

The fact that KMBS customers possess some of the information in Konica's customer lists and/or some of the information is obtainable in the public domain, does not mean that the compiled customer lists are not trade secrets. *See Am. Furukawa, Inc. v. Hossain*, No. 14-13633, 2017 WL 4324945, at *5 (E.D. Mich. Sept. 29, 2017) ("A trade secret may consist of a compilation of information, even if it is compiled from outside sources available to other persons.") (citing *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 410-11 (6th Cir. 2006) ("A trade secret can exist in a combination of ... components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret")). *See also Giasson Aerospace Sci., Inc. v. RCO Eng'g, Inc.*, 680 F. Supp. 2d 830, 843 (E.D. Mich. 2010) ("Knowledge of vendors, vendor capabilities, and pricing can be a trade secret even if all of the information can be obtained through publicly available means so long as the information is not readily ascertainable.").

KMBS also produces evidence that the lists were valuable to it and competitors because – among other things – they contained all the information necessary to compete in the market; they gave insight into how KMBS builds its pricing; and they provided detailed information about sales territories – including what a territory's potential was, what customers bought in the past, what their current equipment was, when leases were coming up, and what the potential was in the future – to assist in creating fair and equal territories and quotas based on the machines in field information.  [*See* ECF No. 434-11, PageID.26860; ECF No. 433-29, PageID.26123-24, 26127-29; ECF No. 435-2, PageID.27532-33 (Rob Bell admits that he sent AI's Vice President of Sales the Everest document because they were in the process of trying to assign new territories for AI's sales representative)].  Indeed, even KMBS's former Vice President for Michigan – who Defendants rely upon in their attempt to show Everest is not a trade secret – testified that Everest would be "priceless" in the hands of a competitor because it "has everything in it. The hardest thing in the job for people to do in competitive situations is get that information. If the competitor gets [Everest], they have it all."  [*Id.*].  This is strong evidence that Konica's customer lists are protectable trade secrets.  *See Innovation Ventures*, 2015 WL 11071470, at *6 (finding plaintiff's customer list to be "a

protected trade secret" because, "[w]ith [it], [defendant] could bypass the trial and error of working with untested distributors, and could rely instead on [plaintiff's] institutional knowledge.").

Finally, contrary to Defendants' arguments, KMBS presents evidence that would allow a reasonable jury to find that it took sufficient steps to protect the confidential nature of its information; among other things, Konica required employees to sign the Agreement and also limited access to certain information based on the position of the employee. *See Kubik*, 56 Mich. App. at 347-48 (finding that sufficient measures to maintain secrecy include express agreements between employers and employees, tacit understandings of confidentiality, inferences from attendant circumstances, and limits on information access to authorized individuals).

Even with its showings, KMBS fails to demonstrate entitlement to summary judgment. AI makes strong arguments and presents evidence that would allow a reasonable jury to conclude that Konica's customer lists are not protectable trade secrets.

Because a reasonable jury could conclude either way on whether KMBS's customer lists are entitled to trade secret protection, neither side is entitled to summary judgment on this issue.

## VII.  DAMAGES

Applied Imaging raises two issues with KMBS's notice of damages. First, AI says Konica's lost profit calculation asserts figures for gross profits instead of net profits; it says gross profits are not recoverable under Michigan law.  Second, AI contends that instead of presenting "actual lost sales for any … customers," Konica only "projected for each of the disputed customers an average of historical profits into the future" – estimating that the losses occurred within a seven-and-a-half-year span and continued for ten years.

KMBS says AI's argument is premature because the parties have yet to engage in expert discovery.  It also says AI incorrectly assumes that its lost profit projections represent gross profit numbers.

At this juncture, AI is not entitled to relief on either issue it raises.

First, while AI is correct that gross profits do not appear to be recoverable in Michigan, *see Contract Design Grp., Inc. v. Wayne State Univ.*, 635 Fed. Appx. 222, 235-36 (6th Cir. 2015) (collecting cases), this should not be an issue, because Konica says it is not seeking gross profits.

Second, unless the court misunderstands AI's argument, there is nothing wrong with KMBS projecting its lost profits based on historical data, instead of presenting *actual* lost profits.  Without a crystal ball, Konica

59

cannot state with certainty its actual profits lost; a projection based on historical data – and taking into account appropriate risk factors and business realities – is acceptable.  *See Contract Design Grp., Inc. v. Wayne State Univ.*, 635 Fed. Appx. 222, 235-37 (6th Cir. 2015).

However, KMBS's notice does not appear to state when its loss began for each of its customers; instead, Konica generally says that it estimates its losses began sometime between April 1, 2011 and November 30, 2018.  While this is insufficient, Konica need not supplement its notice of damages; it can provide this information in its expert report.

Moreover, if Konica intends to project damages for ten years into the future, it must be certain it can adequately support the projections and – as AI says – account for attrition and other business realities.  The Sixth Circuit calls such a long projection into question. *See Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.*, 358 Fed. Appx. 643, 654 (6th Cir. 2009) (affirming the exclusion of an expert report on lost profits that included a "ten-year prediction about the fortunes of the American automotive industry" upon concluding that the opinion rested on speculation regarding profit margins and future demand for a product.).

## VIII.  CONCLUSION

The Court **GRANTS** KMBS partial summary judgment on two issues.

The Court **DECLARES**:

A.    The Agreement is valid and partially enforceable as modified (partially enforced).  The Court: (1) declines to enforce the non-solicitation of potential customers provision of the Agreement; (2) severs the phrase "or whose identity I have learned" from the non-solicitation provision, and limits enforcement of the non-solicitation provision to KMBS's customer with whom the Contract Defendants dealt with while employed by KMBS; and (3) severs the term "or communicate with" from the Agreement's non-solicitation provision.

B.    The Contract Defendants breached the Agreement as specified above.

In all other respects, the Court **DENIES** KMBS's motion [ECF No. 431].

The Court **DENIES** Defendants' motions for partial summary judgment [ECF No. 430, 432].

**IT IS ORDERED**.

S/ Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  July 7, 2020